[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
By petition filed in this court on July 23, 1990, the Department of Children and Youth Services (DCYS), seeks to terminate the parental rights of Donald W. and Jean W. in their son, Scott W., alleging three of the four non-consensual grounds set forth in subsection (b) of Section 17a-112 of the Conn. Gen. Statutes (Rev. of 1991), applicable to children previously committed to DCYS as neglected. Scott W. was found to be neglected on April 6, 1989, and on that date was committed to DCYS for a period not to exceed eighteen months. The commitment was extended for an additional eighteen months on October 6, 1990 and is presently in effect. On the date this Petition was filed, Scott was thirteen years old, having been born on October 16, 1976.
The Petition alleges the existence as to both parents, for a period of not less than one year, of the following statutory grounds:
 (1) Failure to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child.
 (2) Acts of commission or omission resulting in a denial to the child of the care, guidance or control necessary to his physical, educational, moral or emotional well-being.
 (3) There is no ongoing parent-child relationship, which is defined as the relationship that ordinarily develops as a result of a parent having met, on a continuing, day to day basis, the physical, emotional, moral and educational needs of the child, and to allow further time for the establishment or re-establishment of the parent-child relationship would be detrimental to the best interests of the child.
Before proceeding to the merits of the DCYS allegations, mention should be made of the structure of a termination proceeding. A petition to terminate parental rights consists of two phases, adjudicatory and dispositive, Conn. Pr. Book Sections 1042, 1044, 1049. The two phases, however, do not have to be the subjects of separate hearings. One unified trial, such as occurred in this case, is permissible. In re Juvenile Appeal (84-AB), 192 Conn. 254, 259 (1984). CT Page 8690
Although the procedure of one trial is sanctioned, the two phases serve distinctive purposes. In the adjudicatory phase, the court determines the validity of the grounds alleged, and hence, is limited to events which occurred before the filing of the petition on July 23, 1990. The dispositive phase is concerned with what action should be taken in the best interest of the child, and as to that phase, the court may consider matters occurring before the end of the trial on June 20, 1991. In re Juvenile Appeal (84-AB), supra, at 267, 268, n. 19. The dispositive phase is not reached unless at least one of the grounds alleged in the petition is proved by clear and convincing evidence. Conn. Gen. Stat. 17a-112 (b).
 II.
At the trial, the court received testimony from Pamela Michaels, a child welfare specialist at Clinical Consultants of Conn., Dr. David Mantell, a psychologist, Dr. Larry Ash-Morgan, Senior Psychologist at United Services; Kathy Kelly, Social Worker at the Plainfield Public Schools; Charles Lindberg, DCYS Supervisor; Marvin Gregory, Leslie Jellison and Lucia Vallario, DCYS Social Workers. Also placed in evidence were Pamela Michael's Report, Dr. Mantell's Reports dated Dec. 18, 1988 and Feb. 18, 1991, the mandated Social Study, an Addendum to Social Study, and DCYS Treatment Plans dated 6/1/90, 6/1/89 and 12/1/89. Both parents appeared at trial which took place on May 16 and June 20, 1991. There were represented by separate counsel.
From the testimonial and documentary evidence, the court finds the following facts set forth to be relevant and material to this petition.
Scott was born on Oct. 16, 1976, the last of four children born to the respondents. On June 3, 1988, he and his two sisters were placed with relatives because of allegations of sexual abuse made by his sister Lynnette against their father. On Oct. 11, 1988, he was removed from his relatives' home because his grandmother was sick, and was placed in the Bugbee foster home, where he continues to live.
On July 9, 1985, an anonymous referral was made to DCYS stating that Scott's sister, Tammy, said that her sister Lynnette, age 14, and the father were having sex. It was also reported that Scott, age 8, tried to have sex with a 12 year old retarded female neighbor. The family denied all of these charges and the children were deemed by DCYS to be at risk. In late 1985, the father was arrested for molestation of his adult daughter from his first marriage, and served six months in jail. CT Page 8691 Respondent mother attributed this to the fact that the victim would go to bed with anyone. The father was ordered to attend weekly therapy for sex offenders.
On Feb. 29, 1988, the Plainfield Public Schools made a referral to DCYS because Scott's older brother, Glen, age 14, had been sexually molesting Scott, and his parents had been doing nothing about it, although they were aware of it. On June 3, 1988, DCYS went out on another referral, and mother told Marvin Gregory, DCYS worker, that father had been having sexual contact with Scott's two teenage sisters, and that he continued to do so after being asked to stop by mother. Scott was placed with his maternal aunt, and then with his maternal grandparents, because his parents were not able to stop Glen from molesting him.
On July 29, 1988, a neglect petition was filed by DCYS and on April 6, 1989, Scott was adjudicated as neglected, and committed for up to eighteen months.
Dr. Larry Ash-Morgan, the senior psychologist at United Services, treated Scott from Aug. 1988 to June 1989. Scott told Dr. Ash-Morgan that his older brother, Glen, fondled him five or six times while they were on a bed while Glen touched himself. Scott was angry at this and told his teacher, who told Scott's mother. Mother spoke to Glen, but it happened five more times. Scott was very withdrawn, had poor hygiene and was anxious. By June of 1989, he was flourishing in his foster home, which was caring but firm, and which had real good structure.
On Feb. 8, 1989 father was sentenced to ten years in prison for Risk of Injury to a Minor, which arose out of sexual molestation of his daughter.
On April 23, 1990, DCYS received an anonymous referral alleging that mother and her son Glen were having a sexual relationship. Leslie Jellison testified that both mother and Glen admitted to sexual activity with each other, and on Page 6 of Pet's Exhibit 5, "Social Study For Superior Court," Leslie Jellison reported that sexual intercourse between mother and Glen had begun in January, 1990.
Leslie Jellison testified that she first met with mother on March 13, 1989, when she told her that she has to get an understanding of what had been going on in her house, and that DCYS wants Glen, who had sexually abused Scott, and Mother to be in therapy. She did obtain therapy but didn't have a clear understanding of it; she kept excusing father and blamed their daughters for the sexual abuse perpetrated on them by father. She was willing to bring Glen but didn't encourage him, so the CT Page 8692 therapy went nowhere, and the therapist discontinued it. Mother kept excusing father's sexual abuse of his daughters, blaming the girls for father's sexual assaults.
The last time Scott saw his mother and father was Jan. 2, 1990, when Leslie Jellison brought Scott and his mother to Somers Prison to see father. Leslie brought Scott to see mother through July of 1989, when Scott and mother stopped requesting visits. On June 6, 1990, father told Leslie Jellison that he had flunked two sex therapy programs in prison, but he eventually completed these programs.
On Nov. 30, 1988, father was in therapy; on March 23, 1989, Scott's foster parents, the Bugbees, said Scott was depressed over missing his parents; on May 22, 1989 Scott continued to ask about father and wanted to see him. On June 27, 1989, Leslie Jellison brought Scott to see father at Somers Prison, and was told by Scott on July 5, 1989 that he misses his parents. On July 17, 1989, father's sister called DCYS to ask about bringing Scott to Somers Prison, but the Prison would not let Scott visit unless he was accompanied by a legal guardian. Eventually Somers agreed to allow Scott's aunt to bring him, a date was set, but the aunt was laid up, so the visit did not take place. In Nov. 1989, Scott was receiving letters regularly from his father.
From June 30, 1988 to Jan. 2, 1990, Scott had two visits with father and nine with mother. In addition, from Oct. 1989 to Jan. 2, 1990, the Bugbee foster parents were picking mother up every two weeks to bring Scott and her out to lunch at a restaurant. These visits ended because Scott didn't want to visit anymore, and because mother was not changing her own life. She had stopped therapy and was not encouraging Glen to stay in therapy. Furthermore, mother persisted in her denial that father had victimized the girls, and she admitted having intercourse with her son Glen in Jan. 1990. For several months beginning in April, 1990, Scott continued to ask to be adopted. Since mother couldn't understand the need to protect Scott from Glen's sexual molestation, DCYS changed its long term goal from reunification to termination.
In July 1989, Scott said he didn't want any more contact with his home and in Oct. 1989 he said he was afraid to go home because his mother couldn't protect him from his brother Glen.
In DCYS's Administrative Review of Treatment Plan, signed in June of 1990, Respondent Father's Ex. #2, page 4, it is stated that mother and Scott have had no visits in the past 9 months, and that the foster parents and Scott want his adoption. CT Page 8693
 III.
Psychological Evaluation
Dr. David M. Mantell, Ph.D., who testified for the Petitioner, was thoroughly familiar with this family, having evaluated mother, father, Scott, Glen, Lynette and Tammy in Dec. 1988 and then again in Jan. and Feb. 1991. Dr. Mantell testified that the parents cannot be rehabilitated. They cannot identify or address sexual problems; that father blames his own daughters for sexually arousing him; and mother refuses to acknowledge any sexual abuse.
In Petitioner's Ex. #3, the Psychological Report of Dr. Mantell, dated Feb. 18, 1991, he states that "This examiner does not anticipate a reconciliation between Scott and his parents if only because of the sexually deviant nature of the family and the unlikelihood that a rehabilitation can take place. For this reason alone, this examiner judges it to be psychologically damaging for Scott to be exposed to his family since this would involve him in a psychological contamination that would be likely to undermine his own sense of sexual identity and his own value system regarding the expression of his sexual interests."
Concerning the relationship between Scott and his parents, Dr. Mantell's report of Feb. 18, 1991 suggests that he received mixed signals about this relationship, and he therefore had difficulty in reaching a clear-cut conclusion. There was some indication of mutual interest and concern, but the quality of that was questionable.
Dr. Mantell was definite in his conclusion while testifying in this case, that termination of mother and father's parental rights would be in Scott's best interests.
Psychological testimony from professionals is rightly accorded great weight in termination proceedings. In re App. 598, 605 (1987).
 IV
ADJUDICATION (On facts existing on July 23, 1990.)
 A.
The first ground asserted for termination requires the Petitioner prove by clear and convincing evidence that:
 The parents of a child who has been found by the superior court to have been neglected or uncared CT Page 8694 for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child. Conn. Gen. Statutes, Section 17a-112 (b).
Scott was adjudicated as neglected on April 6, 1989, at which time there had been multiple instances of incestuous relationships through this family, including sexual abuse of Scott by his brother, and sexual abuse of Scott's sisters by father, which Scott was aware of.
Father has not rehabilitated himself in that he is unable to accept responsibility for his own acts of sexually assaulting his daughters, blaming them instead, and cannot identify or address family sexual problems, even after completing courses in prison for sex offenders. This is clear from Petitioner's Exhibit #3, pages 5 and 6, Dr. Mantell's report of Feb. 18, 1991.
Mother had not rehabilitated herself in that she also cannot identify or address family sexual problems and further in that since Scott's adjudication, she has had sexual intercourse with her son, Glen, when he was 16 years old. In Pet's Ex #3 on Page 6, Dr. Mantell reports that mother "knows of no sexual contact between her husband and (daughter) Tammy, no sexual contact between her husband and (daughter) Lynette, and no sexual contact between her boys, Glen and Scott." Mother is unable to see what is obvious.
It is apparent from Dr. Mantell's testimony and the record in this case, that this has been a sexually deviant family for many years, that the parents have not rehabilitated themselves, and that there is no basis for the court to believe that the parents could, within a reasonable time, assume a responsible position in Scott's life.
The court's factual findings establish clearly and convincingly that personal rehabilitation has not been achieved by mother and father, and that this ground has been in existence for not less than one year.
The second ground alleged by the Petitioner is that:
 The child has been denied by reason of an act or acts of commission or omission by the father and mother of the care, guidance or control necessary to his physical, educational, moral or emotional well-being. Conn. Gen. Statutes, Section 17a-112
CT Page 8695 (b)(3).
Father is the major reason why this family is grievously dysfunctional. He admits having had incestuous sexual contact with a daughter of his first marriage and with two of Scott's sisters, who of course are his daughters. Kathy Kelly, a Social Worker at Plainfield Public Schools, testified that on Feb. 29, 1988, Scott, who was then eleven years old and in the Fifth grade, reported that his older brother Glen has been touching him in the groin and pulling and bending his penis, and that his parents did nothing about it although they knew that it was going on. During this same period, father was sexually involved with Scott's two sisters and persisted in this after being asked to stop by mother. A few months later Scott was placed outside of the home because he said he told his parents about what Glen was doing to him and Glen's behavior didn't change. Scott was also aware of what his father was doing to his sister.
Neither parent made reasonable efforts to protect Scott from repeated molesting by his older brother.
The court finds that the Petitioner has proved by clear and convincing evidence that both parents have committed acts of commission or omission which have resulted in a denial to Scott of the care, guidance or control necessary to his physical, educational, moral or emotional well-being, and that this ground has existed for more than one year.
The respondent father has raised the question in his brief on Page 16, that if this ground exists at all, it existed prior to the filing of the neglect petition, and therefore if the petitioner didn't think it was grounds for termination then, why did she when the termination petition was filed. One might also ask that, supposing the father had rehabilitated himself so that the failure to rehabilitate ground was not proven, would the petitioner seek termination on the ground of an act of commission or omission that occurred prior to the neglect petition?
The answer to this question is that if there had been rehabilitation, the court could find the act of omission or commission ground proved, but decline to terminate because based upon the rehabilitation, it is not in the best interest of the child to terminate.
The fact that this ground existed before Scott's adjudication as neglected, and the petitioner chose not to seek termination at that time, does not prevent her from doing so at a later date, when this petition was filed. CT Page 8696
The third ground alleged by the petitioner is No Ongoing Parent-Child Relationship. The court finds, based on the entire record in this case, that although there is credible evidence on both sides of this issue, the quantum of evidence is not sufficient to sustain the petitioner's burden of proving this ground by clear and convincing evidence, and the court consequently considers this ground as non-proven.
 V.
DISPOSITION (On facts as of June 20, 1991).
Having found that the first and second grounds were established, the court may proceed with the dispositive phase. Proof of one or more of the statutory grounds does not bring forth orders of termination automatically. To warrant a termination of the parent-child relationship, the court must also find from clear and convincing evidence that termination of parental rights is in the best interest of the child. The court cannot reach this best interest conclusion until it has considered and made written findings on the six factors enumerated in Section 17a-112 (d)(1).
Set forth below are the written findings on the six factors as of June 20, 1991, the date on which the trial ended.
1. Extent of Services Offered or Provided.
 a. Dr. Larry Ash-Morgan, psychologist, treated Scott from Aug. 1988 to June 1989.
 b. DCYS Treatment Plan provided for therapy for Mother and Glen (Treatment Plan of 12/1/89, Respondent Father's Ex. #4).
 c. Father attended sex offender programs at Somers Prison.
 c. DCYS brought mother and Scott to visit father at prison.
 e. DCYS brought Scott to visit mother until she stopped requesting visits.
 f. DCYS put mother in contact with Aid for Dependent Children.
 g. DCYS contacted prison to set up visitation between Scott and father.
CT Page 8697
 h. DCYS agreed to pay mother's taxicab costs for visiting Scott.
 i. DCYS agreed to provide mother with transportation for visits to Scott (Leslie Jellison and successor social worker (Lucy Vallario).
 j. DCYS (Lucy Vallario) drove mother and Scott to psychological evaluations and mother to court. Father has been in prison since 1988.
2. Applicable Court Orders.
The only orders entered by the court were for psychological examinations, which were complied with.
3. Feeling and Emotional Ties of the Child.
Dr. Mantell concluded in his report of Feb. 18, 1991, Pet's Ex. #3 on Page 22: "In the usual sense of a parent and child relationship, such does not appear to be ongoing between Scott and his parents. . . . . there is no evidence to indicate that Scott has a genuine interest in relating to his father as a parent. The appearance is that Scott does not have an interest in relating to his mother as a parent." On Page 16 of this report, Dr. Mantell states that Scott face lights up when the topic of his adoption is raised, because this idea makes him very happy and he says "I really want to be adopted." On Page 15 Dr. Mantell says Scott said he has been happiest at the Bugbee home because he is treats there as part of the family. Scott has lived with his foster parents, the Bugbees, since October of 1988.
4. Age of Scott.
Scott was born on Oct. 16, 1976.
5. Parental Efforts.
Since Feb. 1990, mother has been allowed supervised visitation by contacting DCYS but she has not even attempted one such visit. Since Jan. 1991, neither parent has called DCYS except calls mother made to get rides to court or to a psychological evaluation ordered by the court. (Pet's Ex. #6). Neither parent has acknowledged their responsibility for the problem of sexual abuse in their home, and therefore are not doing what would be basic to solving the problem, and at least making a start toward making it in the best interests of Scott to return home in the forseeable future. Father has made very little effort to maintain contact with Scott or his foster CT Page 8698 parents. On the day in Jan. 1991, that father was evaluated by Dr. Mantell, he could have seen Scott at Dr. Mantell's office, but decided to leave before Scott arrived, even though he had not seen Scott in almost a year. Although father has been in prison for several years, he could have made efforts to have Scott visit him or at least keep in regular contact by telephone or correspondence, but he has made little or no effort to do so. The court feels based on the evidence it has heard, that whatever gestures have been made toward Scott by his parents have been only token gestures, and that they have shown no real interest in being involved, concerned parents.
6. The extent to which a parent has been prevented from maintaining a meaningful relationship by the unreasonable act or conduct of the other parent, or by the unreasonable act of any other person, or by the economic circumstances of the parent.
There is no credible evidence to indicate that either parent has been prevented from maintaining a meaningful relationship by the unreasonable act or conduct of the other parent of the child, or by the unreasonable act of any other person, or by the economic circumstances of the parent. Mother could have had visits all she had to do was call DCYS, which she didn't choose to do. DCYS agreed to provide visitation rides. Father has been in prison because of his own acts; no one else has prevented him from maintaining a meaningful relationship with Scott.
 VI.
Lucy Vallario, DCYS Social Worker, testified that Scott is adoptable and wishes to be adopted, as did Dr. Mantell. In Pet's Exhibit #5, it is stated that Scott has told Leslie Jellison, DCYS Social Worker, on numerous occasions that he would like to be adopted by the Bugbees, with whom he has lived since Oct. 1988.
For the court to consider keeping alive the possibility that Scott might someday return home would fly in the face of reality and would deprive Scott of the stability and permanence he needs. He has been out of his home for more than three years now. His father has a long history of sexual abuse, involving three different daughters, and is serving a lengthy prison term for one of these offenses. Mother had sexual intercourse with her other teenage son as recently as Jan. 1990. Neither parent is willing to confront the problem, so there is no reasonable basis for hoping it is solved or can ever be solved. The parents say that either this repeated abuse never happened, or if it did, that the daughters brought it upon themselves. CT Page 8699
The court finds that the Petitioner has proved by clear and convincing evidence that termination is in the best interest as to both parents; and that over a period of time which is not less than one year, grounds have existed as to both parents for termination of their parental rights. Therefore the petition seeking termination of the parental rights of Scott's mother and father is granted.
 VII
JUDGMENT
It is therefore ORDERED that the parental rights of Jean W. and Donald W. in and to their son, Scott W., are terminated.
 VIII
APPEAL
Jean W. and Donald W. have 20 days from the date of this judgment in which to seek an appeal. If, after being informed by their trial counsel of the court's judgment and their right to take an appeal, they affirmatively manifest their desire to do so, if their trial counsel is willing to act in that capacity, the court will appoint them for this purpose. If the respondents manifest their desire to take an appeal and if their trial counsel declines to represent them because in their professional opinion it lacks merit, they are not required to do so but may file a timely motion to withdraw and to extend time in which to take an appeal. The court will then appoint other attorneys to review this record who will, if willing to represent the mother and father on appeal, be appointed for this purpose. If the second attorneys determine that there is no merit to an appeal, they are requested to make this known to the court at the earliest possible moment and the respondent mother and father will be informed by the clerk forthwith that they have the balance of the extended time to appeal in which to secure their own counsel, who, if qualified, may be appointed to represent them on the appeal. If they do not do so, then upon expiration of the extended appeal pl period, their right to pursue an appeal will be ended and the termination of their parental rights final. The child will at that time, and not before, be free to be placed in adoption.
If such procedures satisfy the sixth amendment right to counsel in criminal cases (Douglas v. California, 372 U.S. 353
(1963) ; Fredericks v. Reincke, 152 Conn. 501 (1965), they are even more appropriate where there are interests of a third party involved: Those of the child whose need for permanent safe CT Page 8700 parenting is entitled to at least as great a degree of consideration as are those of the parents whose right to raise him are at issue. Even unsuccessful appeals delay permanent planning for years since no child may be adopted until the appellate process is exhausted. The need for finality of judgment in cases where the state initiates legal action against indigent respondents, which gave rise to the rule of Douglas and Fredericks, supra, applies as much or more to cases where the person affected by the judgment is a young child for whom the passage of periods of time that may seem short for adults can work changes with lifetime implications.
Richard Walsh, J.